IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

WILLIAM FOSTER,

       Petitioner,              No.  2:07-cv-00238 ALA (HC)

   vs.

BEN CURRY,

       Respondent.[1]         <u>ORDER</u>

_____/

     Pending before this Court are William Foster's (Petitioner") application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254(a) filed February 6, 2007 (doc. 1), and Respondent's Answer (doc. 6).  Also before the Court are the parties' supplemental briefs filed in response to this Court's December 19, 2007 order requesting additional briefing on the applicability of *Irons v. Carey*, 505 F.3d 846 (9th Cir. 2007), if any, to this matter.  For the reasons discussed below, Petitioner's application is denied.

**I**

**A**

     Petitioner was found guilty by a Shasta County Superior Court jury of conspiracy to

_____

[1]Ben Curry is substituted for his predecessor, A.P. Kane, as the warden where the prisoner is incarcerated, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

1   commit murder, in violation of California Penal Code section 187, conspiracy to manufacture

2   methamphetamine, conspiracy to sell methamphetamine, manufacturing and producing

3   methamphetamine, and false imprisonment.  The jury also found that Petitioner was armed with

4   a firearm during the commission of these crimes.  On January 5, 1990, Petitioner was sentenced

5   to serve twenty-five years to life on the conspiracy to commit murder count, and a consecutive

6   one-year term for the use of a deadly weapon in violation of California Penal Code section

7   12022(a).  Sentencing on the remaining counts was stayed by the Shasta County Superior Court.

8                                            **B**

9          At the January 10, 2006 hearing to determine Petitioner's suitability for release on

10   parole, the Board of Parole Hearings ("BPH") relied on the facts summarized in the California

11   Court of Appeal's decision affirming his conviction on direct appeal.[2]  The Court of Appeal's

12   summary reads as follows:

13              In late 1987 several individuals decided to go into business
                manufacturing and marketing methamphetamine.  Two partners
14              Harvey Gesberg, G-E-S-B-E-R-G, and Jim Wooten,
                W-O-O-T-E-N, headed the group.  Various individuals "cooked"
15              and distributed the drug from the laboratory located in a barn at
                "the ranch."  Defendant met Gesberg and became involved in the
16              drug operation in the spring of 1988.  Defendant accompanied
                Gesberg on his sales rounds and began to sell drugs on behalf of
17              Gesberg.  Defendant developed his own sales and distribution
                network.  Eventually defendant became Gesberg's all around
18              assistant or "right-hand man."  On occasion defendant assisted in
                cleaning up after the manufacture of methamphetamine.  Gesberg,
19              Wooten, and defendant, and one other assistant, Gothan,
                G-O-T-H-A-N, collected all the money owed by buyers.  Other
20              members of the organization sold the drugs.  Collection tactics
                practiced by the four included beatings for late payment and death
21              threats to individuals who got in their way.  To collect money and
                to protect the business from competition, the four collectors,
22              including defendants, carried weapons.  Their arsenal included
                handguns, machine gun, assault rifles, and dynamite.  Members of
23              the group, including defendant, discussed the use of deadly force
                against intruders.  In the summer of 1988, Wooten and Gesberg
24              suspected one of their distributors Kenny Urbon, U-R-B-O-N, was
                cheating them.  They also feared Urbon was cooperating with

25

26          [2] Cited as *People v. Foster*, 3 Crim. COO8123, November 21, in the BPH's decision.

                                              2

authorities.  Urbon had trouble paying for his drugs, a problem discussed by the group including defendant, Wooten and Gesberg told several people Urbon "would be taken care of."  On the morning of June 4, 1988, Wooten and Gesberg bailed defendant out of jail for a minor offense.  And there's a footnote that there's some uncertainty as to the exact date.  Jail records indicate that the defendant was in jail from 2:50 a.m. on June 3rd to 3:20 a.m. on June 6.  This conflicts with the testimony of several witnesses who testified defendant was at the ranch on June 4.  After his release from jail, defendant "ran into" a former acquaintance Curtis, C-U-R-T-I-S, Jones.  Jones told defendant he used to be a hit man.  Defendant returned to the ranch and told Wooten he had made contact with someone willing to help them take care of the troublesome Urbon.  At Wooten's request, defendant contacted Jones and asked him to come to the ranch for a meeting and again we have the footnote.  These facts are taken from a transcript of a tape recorded interview between the Department of Justice Special Agent Matthews and defendant.  At trial defendant objected to admission of both the recording itself and the transcript.  Defendant and Jones arrived at the ranch in the early evening.  Jones dropped defendant off and told him he was going to wait for a call summoning him back to the ranch.  Urbon, who was at the ranch waiting for Wooten, asked defendant who Jones was.  Defendant responded, Jones was his "homeboy."  And a "ex-red and white" (Hells Angels) hit man.  Shortly after midnight Jones returned and met with Wooten, defendant, and another identified party in Wooten's office.  During this meeting, Jones agreed to rough up Urbon and to "close his mouth" if Urbon started to talk.  Another foot note: According to defendant's testimony, during the tape's interview and Curtis (Jones) and Jim (Wooten) started talking and Curtis started Curtis started making his boost that he was, you know, a hit man and all like that.  And well the whole conversation was in (inaudible).  Kenny Urbon and Curtis left the ranch Mr. Matthews: What was the agreement at the ranch with Jim and Curtis?  Mr. Foster: That Curtis was going to rough him up.  I heard him and then they started talking about "well, what if he talks?"  And Curtis said well, I'll just have to have his mouth closed and Jim said well, it sounds like a good idea because he would implicate everybody, you know, so Curtis says okay.  In return Jones received one ounce of methamphetamine and various future unspecified "favors."  The group broke up, Jones approached Urbon and began talking to him.  Jones suggested he and Urbon go for a ride and do a line of methamphetamine.  Urbon, although somewhat hazed, agreed and the two left in Jones' truck.  As Jones drove, he told Urbon he worked as a hit man for the Mafia.  Jones eventually pulled off the dirt road onto and turned off the motor.  Urbon complained he could not see and flicked his lighter.  As the lighter flickered, Jones shot Urbon on the left side with a 44 magnum handgun.  Urbon flung against the door by the impact, managed to kick at Jones.  Jones fired begun (sic), striking the dashboard ashtray.  Jones dropped the gun,

3

opened the driver's door and fell out of the truck. Urbon leaped
from the truck, trampling Jones in the process. As Urbon ran,
Jones fired four more shots in his direction. Jones missed. Urbon
hid in the bushes. After searching briefly, Jones left. Urbon ran
into the woods. A few hours later Urbon saw two sets of
headlights approaching. He saw between six and eight people with
flashlights searching nearby. They called his name and Urbon
recognized Wooten's voice. After searching the area, they left.
The next morning Urbon found a mining camp and called friends
to pick him up. Urbon avoided calling the police or an ambulance
because there were warrants out for his arrest. Urbon also called
Wooten and asked why he had been shot. Wooten told Urbon he
couldn't talk because the defendant was there. Urbon told Wooten
he was coming to the ranch to get his car. Urbon believed Wooten
and Gesberg might be involved in the shooting. When Urbon
arrived at the ranch, he ran into the defendant who was armed.
Defendant told Urbon to get out of there. When Urbon went into
the house, both Wooten and Gesberg denied any knowledge of the
shooting. Urbon's wounds were treated and Wooten was - - and
Wooten gave a false identification so Urbon could go to the
hospital. Urbon checked into the hospital with a bullet wound in
his left arm and side. The hospital contacted the sheriff's
department. When questioned by deputies, Urbon told them the
whole story. Information was filed, subsequently amended,
charging defendant with conspiracy to manufacture and sell
methamphetamine and commit murder with allegations of six overt
acts, count one; conspiracy to commit murder of Urbon with
allegation of six overt acts, count 2; conspiracy to manufacture
methamphetamine with allegation of six overt acts, count three;
conspiracy to sell methamphetamine with the allegation of six
overt acts, count four; manufacturing and producing
methamphetamine, count five; and false imprisonment, count six
to 10. The information further alleged defendant personally used a
firearm in the offense charged.

At the conclusion of the January 10, 2006 hearing, the BPH found that Petitioner was not

suitable for release on parole because he would pose an unreasonable risk of danger to society or

a threat to public safety if released from prison.

Petitioner filed a state petition for writ of habeas corpus before the Shasta County

Superior Court. That court denied the petition on July 13, 2006. Its decision reads as follows:

On October 6, 1989, a jury found petitioner guilty of
conspiracy to manufacture and sell methamphetamine and
conspiracy to commit murder. The jury also found the defendant
was armed with a firearm during commission of the crimes.
Petitioner was sentenced to 26 years to life in prison.

4

On January 10, 2006, petitioner had an Initial Parole Consideration Hearing.  The parole board denied parole for one year.  On May 17, 2006, petitioner filed a Writ of Habeas Corpus alleging the board illegally found petitioner unsuitable for parole, thereby violating his due process and equal protection rights.  For the reasons set forth below, Petitioner's application is denied.

In finding petitioner unsuitable for parole, the board relied primarily on the specific facts of petitioner's crime, which involved petitioner arranging for a "hit man" to shoot the victim.  The board also indicated that petitioner's motive in arranging the victim's attempted murder occurred while petitioner was engaged in ". . . the use of drugs, the dealing in (sic) manufacturing of drugs . . ." and that petitioner had been ". . . a major part of the drug culture in Shasta County . . .".  (Please refer to the transcript of Petitioner's Initial Parole Consideration Hearing, hereinafter referred to as "RT", dated January 10, 2006, page 84, lines 3-10).  The board also stated in its decision that the crime was ". . . carried out in a dispassionate and calculated manner, such as execution style."  (RT, page 84, lines 8-10.)  The board declared that because of petitioner's past criminal conduct and the circumstances of the crime, he would pose and "unreasonable risk of danger to society or a threat to public safety if released from prison," (RT, page 83, lines 17-19.)

Petitioner first denies his involvement in arranging for the victim's murder, and then conversely argues that because he only arranged for the victim's murder and did not participate in the actual shooting of the victim, he should be deemed less culpable and therefore suitable for parole.  In support of his position, petitioner relies heavily on the facts of *In re George Scott* (2004) 119 Cal.App.4th 871.  However, the facts of that case are not even remotely similar to the facts of petitioner's crime.  As the board pointed out, petitioner in this case was engaged in the manufacture of methamphetamine; had entered into an agreement with other co-conspirators to protect his illegal enterprise by intimidation, violence and murder, and had armed himself in order to further that agreement, which culminated in the attempted murder of the victim.

A denial of parole by the Board of Prison Terms is subject to judicial review only to determine if the decision was supported by "some evidence" and if the requirements of procedural due process were followed. (In re Robert Rosenkrantz (2002) 29 Cal.4th 616.

According to the applicable regulation, circumstances, tending to establish unsuitability for parole are that the prisoner (1) committed the offense in an especially heinous, atrocious, or cruel manner; (2) possesses a previous record of violence; (3) has an unstable social history; (4) previously has sexually assaulted

another individual in a sadistic manner; (5) has a lengthy history of severe mental problems related to the offense; (6) has engaged in serious misconduct while in prison. (Cal. Code. Regs. Tit 15, §2402 subd. (c).)  Factors that support a finding that the prisoner committed the offense in an especially heinous, atrocious, or cruel manner include the following: (A) multiple victims were attacked, injured, or killed in the same or separate incidents; (B) the offense was carried out in a dispassionate and calculated manner, such as an execution-style murder; (C) the victim was abused, defiled, or mutilated during or after the offense; (D) the offense was carried out in a manner that demonstrates and exceptionally callous disregard for human suffering; and (E) the motive for the crime is inexplicable or very trivial in relation to the offense. (Cal.Code.Regs.Tit 15, §2402 subd. (c)(1).)

**The nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole.** (*In re Minnis*, (1972) 7 Cal.3d. 639; *In re Seabock* (1983) 140 Cal.App.3d. 29.) While the board commended petitioner for his participation in various rehabilitative programs during his incarceration, parole was properly denied based on the factors cited by the board in its decision.

For the reasons set forth above, Petitioner's Writ of Habeas Corpus is DENIED.

Petitioner filed a state petition for a writ of habeas corpus before the California Court of Appeal for the Third Appellate District.  That court summarily denied the petition on September 14, 2006.  Petitioner filed a petition for review before the California Supreme Court.  It was summarily denied on November 29, 2006.  On February 6, 2007, Petitioner filed a timely application for a writ of habeas corpus in this Court pursuant to 28 U.S.C. §2254(a).  He exhausted each of his federal constitutional claims in state court.

### III

### A

Petitioner contends that he is entitled to habeas corpus relief pursuant to § 2254(a) on discrete grounds.  He alleges that in refusing to set a parole release date, the BPH deprived him of a liberty interest protected under the Fifth and Fourteenth Amendments.

He also argues that the BPH's decision that he was unsuitable for release on parole was not supported by some evidence that he personally committed a heinous, atrocious, or cruel

crime.

Petitioner further maintains that the BPH violated his federal due process rights by ignoring relevant information in the record, and denying him a parole release date based on factors that showed him to be suitable for release.

In addition, he asserts that the BPH violated due process in denying him a release date based on a "no anti, and/or under exclusion, parole policy."  Petr's Application for a Writ of Habeas Corpus, Mem. P. & A., 11.

Finally, he claims that he was denied a fair hearing before an impartial parole board.

An application for a writ of habeas corpus on behalf of a person in custody pursuant to a state court judgment "shall not be granted with respect to any claim that was adjudicated on the merits" in state court unless the adjudication of the claim:

(1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)    resulted in a decision that was based on an unreasonable determination of the facts in light of  the evidence presented in the State court proceeding.

28 U.S.C. §2254(d).

As noted above, the California Court of Appeal and the California Supreme Court summarily denied Petitioner's state petition for habeas corpus relief.  The Shasta County Superior Court, however, issued a decision explaining its reasons for denying Petitioner's request for a writ of habeas corpus.  Pursuant to *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991), this Court must presume, "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground. Accordingly, in applying § 2254(d), this Court must "look through" the unexplained decisions of the California Court of Appeal, and the California Supreme Court, to the decision of the Shasta County Superior Court to determine whether its decision was contrary to, or involved an

7

1   unreasonable application of clearly established federal law, as determined by the Supreme Court

2   of the United States.  *Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000).

### B

4        In his answer to Petitioner's application, Respondent contends that Petitioner is not

5   entitled to habeas corpus relief because he does not have a liberty interest in parole.  Respondent

6   maintains that "California's  parole statute provides for a two-step process that does not impose a

7   mandatory duty to grant parole release unless and until the Board finds an inmate suitable for

8   parole."  Respt's Answer to Pet. for Writ of Habeas Corpus 4.

9        Respondent's contention that a prisoner does not have a liberty interest in receiving a

10   parole release date under California law is contrary to the Ninth Circuit's decision in *Sass v. Cal.*

11   *Bd. of Prison Terms*, 461 F.3d 1123 (9th Cir. 2006).  Accordingly, this Court must reject

12   Respondent's argument under compulsion of *Sass* which expressly provides that "California's

13   parole scheme gives rise to a cognizable liberty interest in release on parole."  *Id.* at 1127.

14        In his December 31, 2007 response to this Court's order for supplemental briefing

15   regarding the applicability, if any, of the "some evidence" standard applied in *Irons v. Carey*,

16   479 F.3d 658 (9th Cir. 2007) to this matter, Respondent argues that "*Irons* is not 'clearly

17   established Federal law, as determined by the Supreme Court of the United States.'"  *Id*. at 6.

18        In *Superintendent v. Hill*, 472 U.S. 445, 454, 454 (1985), the Supreme Court held that

19   "revocation of good time does not comport with 'the minimum requirements of procedural due

20   process,' unless the findings of the prison disciplinary board are supported by some evidence in

21   the record."  (Citation omitted).  This Court is bound by the Ninth Circuit's holding in *Sass* that

22   the some evidence standard applies to parole release proceedings.  461 F.3d at 1128-29; *see*

23   *Irons*, 505 F.3d at 851 ("the Supreme Court ha[s] clearly established that a parole board's

24   decision deprives a prisoner of due process with respect to this interest if the board's decision is

25   not supported by 'some evidence in the record,' . . . or is 'otherwise arbitrary'").

26        This Court cannot contravene that holding.  *See Zuniga v. United Can Co.*, 812 F.2d 443,

8

1   450 (9th Cir. 1987) (citation omitted) ("District courts are, of course, bound by the law of their

2   own circuit, and 'are not to resolve splits between circuits no matter how egregiously in error

3   they may feel their own circuit to be.'").  Therefore, this Court must reject Respondent's

4   argument that the some evidence standard does not apply.

5       In *Irons*, the Ninth Circuit held that

6          where, as here, there is some evidence to support a finding that
           "the offense was carried out in a manner which demonstrates an
7          exceptionally callous disregard for human suffering" and the
           "motive for the crime is inexplicable or very trivial in relation to
8          the offense," Cal. Code Regs., tit. 15 § 2402(c)(1)(D)-(E), we
           cannot say that the state court unreasonably applied *Hill*'s "some
9          evidence" principle.

10  *Irons*, 505 F.3d at 853.

11      In *Irons*, the record showed that the BPT relied on the commitment offense in

12  determining that the prisoner was not suitable for release on parole.  *Id.* at 852.

13      The Ninth Circuit limited its holding in *Irons* as follows: "All we held in [*Sass*, 461 F.3d

14  at 1125 and *Biggs v. Terhune*, 334 F.3d 910, 912 (9th Cir. 2002)] and all we hold today, therefore,

15  is that, given the particular circumstances of the offenses of these cases, due process was not

16  violated when these prisoners were deemed unsuitable for parole prior to the expiration of their

17  minimum terms."  505 F.3d at 853-54.

18      In the precedential portion of the *Irons* decision, the Court held that "we must look to

19  California law to determine the findings that are necessary to deem a prisoner unsuitable for

20  parole, and then must review the record in order to determine whether the state court decision

21  holding that these findings were supported by 'some evidence.'" *Irons*, 505 F.3d at 851.  A

22  prisoner's commitment offense, on its own, may justify parole denial if "the Board can 'point to

23  factors beyond the minimum elements of the crime for which the inmate was committed' that

24  demonstrate the inmate will, at the time of the suitability hearing, present a danger to society if

25  released." *Id.* at 852 (quoting *Dannenberg*, 34 Cal. 4th 1061,1071 (2005)).  An offense

26  committed in an especially heinous, atrocious or cruel manner is a factor tending to show

1    unsuitability for release.  Cal. Code. Regs., tit. 15 § 2402(c)(1).

2          Based on controlling Ninth Circuit authority, this Court must determine whether some

3    evidence supported the BPH's January 10, 2006 decision to deny a release on parole to Petitioner.

4                                              **IV**

5          The BPH's decision reads as follows :

6          **PRESIDING COMMISSIONER GARNER:** Okay.  The time is
           now 2:34 p.m. and in the matter of William Foster, CDC number
7          E-42760.  Before we get stated Mr. Foster, I don't know what you
           came here expecting today, but we've considered everything with
8          we've heard today and what we want to do is tell you first of all is
           that you did a good job today, a very good job.  I know it was
9          tough.  It was very tough.  The Panel has reviewed all the
           information received from the public and relied on the following
10         circumstances in concluding that you're not suitable for parole and
           would pose an unreasonable risk of danger to society or a threat to
11         public safety if released from prison.  And here is where I want to
           interject.  This is your initial hearing and I don't know what you've
12         heard about the normal range of denial years on the initial hearings,
           but it can go all the way to five and, sir, we're going to deny you for
13         one year, so I want you to hear that up front so you pay particular
           attention while we go through the reading of the decision.  Okay.
14         With respect to the commitment offense, the Panel concluded it was
           carried out in a accept (sic) cruel and callous manner, in that we had
15         a guy that was set up.  We had an individual that was basically set
           up, and there for the grace of whatever superior being, a inch one
16         way or another could of had you facing a capital offense.  The
           offense was carried out in a dispassionate and calculated manner,
17         such as an execution style.  We had an individual that was in a
           vehicle, close range, shot by a 44 magnum, a very powerful
18         weapon.  First one did hit him.  The next was when he kicked was
           fired into the dash and then there were four more fired while he was
19         pursuing, so any one of those other five rounds could of certainly
           changed this whole scenario into a far worse situation.  Sir, with
20         respect to your previous criminal record, we found that you had
           some minor vehicle code violations that actually at one point let
21         you to be jailed for the 14601s, and that was during the period of
           time that you were driving on a suspended or revoked license.  And
22         that you did fail - - society did attempt to deal with that by the
           county jail camp and also the adult probation.  The Panel concluded
23         you did have a period of an unstable social shift and that, again,
           relates back to the drugs.  The use of drugs, the dealing in
24         manufacturing of drugs, and certainly we did take into note and
           consider very seriously your assessment of the impact of what you
25         did.  We heard you loud and clear.  You had a lot of insight with
           respect to that and with regard to that, you know, you were a major
26         part of the drug culture in Shasta County and I think you've

1    reflected on that very adequately portrayed that to the Panel.
     You've programmed very well while you've been in here.  You've
2    put the time to good use.  You did upgrade yourself educationally.
     The Panel did note that you've had three 128s, the last one was
3    March of '04 for failure to report and one 115, which was the
     grooming, which as you say that issue got resolved.  The Panel read
4    and considered Dr. Macomber's report dated December 2005 and
     the doctor's conclusion that - - it's favorable.  It's a report that's
5    favorable to your interests.  With respect to your parole plans, we
     find your plans are viable, both the ones in Shasta County and also
6    in the home state of Ohio, which my understanding would be your
     preference between the two is to return home to Ohio.  In response
7    to 3042 notices, we did have a representative from the Shasta
     County District Attorney's Office who I believe spent quite a bit of
8    time commending you on what you've done, in here and indicated
     that and in spite of that you need a little bit more time for
9    rehabilitation, but generally was speaking and saying some very
     nice things about what you've done in here.  The Panel wants to
10   commend you for your vocational certificates, particularly one of
     those where some goals were met and exceeded.  You've got good
11   work history, you're discipline free, commend you for your
     Coastline College, Native American Center studies and al of those
12   things and also your work history and all the chronos that you got.
     However, these positive aspects of your behavior don't outweigh
13   the factors of unsuitability which were previously read.  As I say,
     sir, this is a one-year denial and you heard me read your minimum
14   eligible parole date so you're real close on that, so what we're
     going to recommend between now and the time that you come back
15   before the Panel next year, early next year, continue to keep
     yourself discipline free, wherever possible, continue to do your self-
16   help, anything you can do educationally.  The one thing you should
     do in anticipation of next year is get all of your parole plans
17   updated.  And you also might begin to identify more adequately
     some of the support based group that would be available for you in
18   Ohio, either through the Cherokee tribe or through other out lets
     (sic) so that when you come in you've got yourself a compete
19   package that is not only representative of that's going to be
     available, but is current with respect to time.  And with that I'll ask
20   Commissioner Blonien if there's anything she'd like to add?

21   **DEPUTY COMMISSIONER BLONIEN:** I do.  You've been in
     prison a long time and you finally had your initial hearing.  Your
22   next hearing is one year away.  It goes like that.  You start working
     on it tomorrow.  Currently, the Board can't parole you to Ohio.
23   You parole to your other viable parole place and I'd make sure that
     that was - - I mean, that letter was great, but anything else you can
24   do in that arena would be helpful and then you apply for parole, an
     interstate compact to Ohio.  I don't know if Ohio is an interstate
25   compact state.  I think it is and that's something that you might be
     able to utilize your Indian corrections because that might even have
26   something that would allow us to parole you there.  I don't know

                                    11

that, but since it's a sovereign nation that could be possible.  Your articulation your remorse and your values I thought were very powerful and it's certainly not something you practiced, but it is when you read the transcript the points you want to make in terms of your ability to make good decisions now and your ability to say no.  Don't assume that the next Panel will have read everything because it's almost impossible to read everything and on your initial hearing we really make an effort and I really went through your C file and I don't know if that will happen the next time, so it's your responsibility to bring your resume in terms of what you've accomplished and refer to it so that nothing is forgotten and enjoy today, but work tomorrow.  So good luck.

**INMATE FOSTER:** Thank you very much.

**DEPUTY COMMISSIONER BLONIEN:** You're welcome.

**PRESIDING COMMISSIONER GARNER:** And before we go off the record I realize I'm forgetting I need a statement of facts that need to get done, so if you'd bear with me just a second.  My enthusiasm to keep you calmed down with just the notice for one year.  So I'm going to be reading again from the appellate decision that filed on November 21, 1991, decision C 008123.  In late 1987 several individuals decided to go into business manufacturing and marketing methamphetamine.  Two partners Harvey Gesberg, G-E-S-B-E-R-G, and Jim Wooten, W-O-O-T-E-N, headed the group.  Various individuals "cooked" and distributed the drug from the laboratory located in a barn at "the ranch."  Defendant met Gesberg and became involved in the drug operation in the spring of 1988.  Defendant accompanied Gesberg on his sales rounds and began to sell drugs on behalf of Gesberg.  Defendant developed his own sells (sic) and distribution network.  Eventually defendant became Gesberg's all around assistant or "right hand man."  On occasion defendant assisted in cleaning up after the manufacture of methamphetamine.  Gesberg, Wooten, and defendant, and one other assistant, Gothan, G-O-T-H-A-N, collected all the money owed by buyers.  Other members of the organization sold the drugs.  Collection tactics practiced by the four included beatings for late payment and death threats to individuals who got in their way.  To collect money and to protect the business from competition, the four collectors, including defendants, carried weapons.  Their arsenal included handguns, machine gun, assault rifles, and dynamite.  Members of the group, including defendant, discussed the use of deadly force against intruders.  In the summer of 1988, Wooten and Gesberg suspected one of their distributors Kenny Urbon, U-R-B-O-N, was cheating them.  They also feared Urbon was cooperating with authorities.  Urbon had trouble paying for his drugs, a problem discussed by the group including defendant, Wooten and Gesberg told several people Urbon "would be taken care of."  On the morning of June 4, 1988, Wooten and Gesberg bailed defendant out of jail for a minor offense.  After his release

12

from jail defendant "ran into" a former acquaintance Curtis,
C-U-R-T-I-S, Jones.  Jones told defendant he used to be a hit man.
Defendant returned to the ranch and told Wooten he had made
contact with someone willing to help them take care of the
troublesome Urbon.  At Wooten's request, defendant contacted
Jones and asked him to come to the ranch for a meeting.  Defendant
and Jones arrived at the ranch in the early evening.  Jones dropped
defendant off and told him he was going to wait for a call
summoning him back to the ranch.  Urban, who was at the ranch
waiting for Wooten, asked defendant who Jones was.  Defendant
responded, Jones was "homeboy."  And a "ex-red and white" (Hells
Angels hit man).  Shortly after midnight Jones returned and met
with Wooten, defendant, and other identified party in Wooten's
office.  During this meeting, Jones agreed to rough up Urbon and to
"close his mouth" if Urbon started to talk.  In return Jones received
one ounce of methamphetamine and various future unspecified
"favors."  The group broke up, Jones approached Urbon and began
talking to him.  Jones suggested he and Urbon go for a ride and do a
line of methamphetamine.  Urbon, although somewhat hazed,
agreed and the two left in Jones' truck.  As Jones drove, he told
Urbon he worked as a hit man for the Mafia.  Jones eventually
pulled off the dirt road onto - - and turned off the motor.  Urbon
complained he could not see and flicked his lighter.  As the lighter
flickered, Jones shot Urbon on the left side with a 44 magnum
handgun.  Urbon flung against the door by the impact, managed to
kick at Jones.  Jones fired begun (sic), striking the dashboard
ashtray.  Jones dropped the gun, opened the driver's door and fell
out of the truck.  Urbon leaped from the truck, trampling Jones in
the process.  As Urbon ran, Jones fired four more shots in his
direction.  Jones missed.  Urbon hid in the bushes.  After searching
briefly, Jones left.  Urbon ran into the woods.  A few hours later
Urbon saw two sets of headlights approaching.  He saw between six
and eight people with flashlights searching nearby.  They called his
name and Urbon recognized Wooten's voice.  After searching the
area, they left.  The next morning Urbon found a mining camp and
called friends to pick him up.  Urbon avoided calling the police or
an ambulance because there were warrants out for his arrest.  Urbon
also called Wooten and asked why he had been shot.  Wooten told
Urbon he couldn't talk because the defendant was there.  Urbon told
Wooten he was coming to the ranch to get his car.  Urbon believed
Wooten and Gesberg might be involved in the shooting.  When
Urbon arrived at the ranch, he ran into the defendant who was
armed.  Defendant told Urbon to get out of there.  When Urbon
went into the house, both Wooten [and] Gesberg denied any
knowledge of the shooting.  Urbon's wounds were treated and
Wooten was - - and Wooten gave a false identification so Urbon
could go to the hospital.  Urbon checked into the hospital with a
bullet wound in his left arm and side.  The hospital contacted the
sheriff's department.  When questioned by deputies, Urbon told
them the whole story.  Information was filed, subsequently
amended, charging defendant with conspiracy to manufacture and

1   sell methamphetamine and commit murder with allegations of six
    overt acts, count one; conspiracy to commit murder of Urbon with
2   allegation of six overt acts, count 2; conspiracy to manufacture
    methamphetamine with allegation of six overt acts, count three;
3   conspiracy to sell methamphetamine with the allegation of six overt
    acts, count four; manufacturing and producing methamphetamine,
4   count five; and false imprisonment, count six to 10.   And with that,
    the time is now 2:47 p.m. and that concludes this hearing.  Good
5   luck, sir.

6                                      **V**

7                                      **A**

8        In his application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254(a), Petitioner

9   asserts that the BPH violated his liberty interest by relying on "the gravity of the acts in the

10  commitment offense that he did not personally commit."  Petitioner contends that he was

11  convicted of conspiring to commit murder - not of the physical act of murder.  He argues that the

12  risk of future harm posed by a person who conspires with others to hire a "hit man" to kill

13  someone must be evaluated differently from the suitability for parole release of the person who

14  attempted to kill the victim in furtherance of the conspiracy.

15       Petitioner cites no authority to support this proposition.  Nevertheless, he is correct in

16  stating that this Court must determine whether the record contains some evidence that Petitioner

17  is unsuitable for parole release based on his own conduct in conspiring to kill another person, as

18  well as his prior criminal activities.  After arguing that "[t]he Board is constrained by law to

19  evaluate Petitioner's current risk of threat based on his INDIVIDUAL factors," Petitioner asserts

20  inconsistently that by permitting his co-conspirators to receive reduced sentences, one for nine

21  years, the other for twelve years, for agreeing to testify against him, "[t]he state has thereby

22  indicated that these two individuals, who were as culpable as petitioner, were not continuing

23  threats to society long ago.  How then can the same state, evaluating the same circumstances,

24  assess Petitioner as an unreasonable risk to society some 17 years later. . . .?"

25       Petitioner's argument is premised on the logical fallacy known as *post hoc*, *ergo, propter*

26  *hoc*, as illustrated by the following syllogism:

                                        14

Petitioner's co-conspirators receive reduced sentences of nine and twelve years, respectively, in exchange for their agreement to testify against Petitioner.

Petitioner was convicted of conspiracy to commit the same crime.

Therefore, Petitioner was no longer a threat to public safety, and suitable for release on parole after serving twelve years.

This Court lacks the authority to determine whether the state trial court abused its discretion in accepting the guilty pleas of Petitioner's co-conspirators and agreeing to impose a reduced sentence in exchange for their agreement to testify against the Petitioner. Instead, this Court is limited in its review of Petitioner's application to a determination whether the state courts violated Petitioner's federal constitutional rights in rejecting his state petition for habeas corpus relief.

**B**

In *Biggs v. Terhune*, 334 F.3d 910 (9th Cir. 2003), in affirming the denial of a parole release, the Ninth Circuit held that " [California Penal Code] Section 3041(b) allows the gravity of the offense to be considered in requiring a period of longer incarceration," *Id*. at 916. Thus, Petitioner's contention that the BPH cannot base its decision on the commitment offense is contrary to binding precedent. Section 3041(b) provides that the BPH

shall set a release date unless it determines the gravity of the offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting.

The BPH declined to set a release date because it concluded that the commitment offense was carried out in an especially cruel and callous manner. It also found that it was carried out in a dispassionate and calculated manner "such as an execution style murder."

California Code of Regulations §2281 sets forth the circumstances that tend to show unsuitability for parole release. Section 2281(c)(1) provides as follows:

(1) Commitment Offense: The prisoner committed the offense in an

15

especially heinous, atrocious or cruel manner.

The factors to be considered include:

(A) Multiple victims were attacked, injured or killed in the same or separate incidents.
(B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.
(C) The victim was abused, defiled or mutilated during or after the offense.
(D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.
(E) The motive for the crime is inexplicable or very trivial in relation to the offense.

The evidence considered by the BPH supports its finding that Petitioner was unsuitable for release on parole.  Petitioner was involved in a large scale conspiracy to manufacture and sell methamphetamine in Shasta County.  In collecting money from their customers, Petitioner and his co-conspirators approved beating and threatening them with death if their payments were overdue.  To protect their illegal enterprise from competition and to aid in their collection efforts, Petitioner and his co-conspirators armed themselves with, handguns, a machine gun, assault rifles, and dynamite.  They also contemplated the use of deadly force against intruders.

Because Petitioner and his co-conspirators feared that Kenny Urbon, one of their distributors, was cheating them and had become a police informant, they agreed that Urbon "would be taken care of."

On June 4, 1988, Petitioner encountered Curtis Jones, a former acquaintance.  Petitioner was told by Jones that he used to be a hitman.  Petitioner informed his co-conspirator, Jim Wooten, that he had contacted someone who could help them take care of Urbon.  Wooten requested that Jones be asked to meet with the co-conspirators.  Jones drove Petitioner to the meeting place.

Jones agreed to rough up Urbon and "close his mouth" if he started to talk.  In return for his agreement, Jones was given one ounce of methamphetamine and promised future "favors."  After the meeting, Jones introduced himself to Urbon and suggested that they go for a ride and

1  ingest a line of methamphetamine.  Urbon agreed.

2  Jones drove Urbon to a wooded area where he stopped his truck off the road.  There he

3  shot and wounded Urbon with a .44 Magnum.  As Urbon fled from the truck, Jones fired five

4  more shots at Urbon.   None met its mark.  Urbon's wound was not fatal.

5  These facts demonstrate that Petitioner participated in hiring a self-described hit man with

6  the intention of murdering Urbon because he was suspected of being a police informer.  Pursuant

7  to his agreement with Petitioner and his co-conspirators, the hit man unsuccessfully attempted to

8  kill Urbon by firing six shots at him.

9  These facts clearly demonstrate that Petitioner's conduct in hiring a self-described Mafia

10  hitman to kill another person constituted some evidence that Petitioner engaged in an especially

11  heinous and cruel crime with the intent to carry out a dispassionate and calculated execution-style

12  murder.  The BPH also properly considered the fact that prior to conspiring to execute Urbon,

13  Petitioner used drugs, and manufactured methamphetamine.  It also noted that Petitioner's prior

14  incarceration and adult probation had failed to prevent him from resorting to escalating criminal

15  conduct.

16  The BPH further noted that Petitioner had "programmed very well" while imprisoned and

17  had received a favorable psychological evaluation.  The BPH concluded, however, that "these

18  positive aspects of your behavior don't outweigh the factors of unsuitability which were

19  previously read."

20  **C**

21  Contrary to Petitioner's contention, the BPH properly considered the circumstances set

22  forth in California Code of Regulations § 2281 that tend to show suitability for parole release, but

23  concluded that these factors were outweighed by the facts demonstrating that the gravity of his

24  convicted offenses required a more lengthy period of incarceration to protect public safety.

25  "To determine whether the some evidence standard is met 'does not require examination

26  of the entire record, independent assessment of the credibility of witnesses, or weighing of the

1   evidence.  Instead, the relevant test is whether there is any evidence in the record that could

2   support the conclusion reached by the disciplinary board.'" *Sass*, 461 F.3d at 1128 (quoting *Hill*,

3   472 U.S. at 455-56).  "Hill's some evidence standard is minimal, and assures that 'the record is

4   not so devoid of evidence that the findings of the disciplinary board were without support or

5   otherwise arbitrary.'" *Id.* at 1129 (quoting *Hill*, 472 U.S. at 457).

6                                                    **D**

7           Petitioner failed to allege any facts that support his contention that the BPH panel that

8   denied him a parole release date was not impartial, or that it was operating under a "no/anti or

9   under inclusion parole policy."  Therefore, these contentions do not support his claim that his

10  liberty interest in receiving a parole release date was violated under California law.[3]

11                                            **Conclusion**

12           The BPH decided not to set a release date because it considered that the cruel nature of

13  Petitioner's crime continues to pose a risk of danger to society if he is set free.  This finding

14  outweighs the fact that he has performed well while confined under twenty-four hour supervision

15  by prison guards.  Thus, the BPH's decision is supported by some evidence.

16           For the same reason, the decision of the Shasta County Superior Court denying

17  Petitioner's state habeas corpus petition was not "contrary to, or involved an unreasonable

18  application of, clearly established federal law, as determined by the Supreme Court of the United

19  States."  28 U.S.C. §2254(d).

20  /////

21  /////

22  /////

23

24          [3]  The record shows that Petitioner was informed by Presiding Commissioner Garner that:
    "you also have the right to be heard by an impartial panel."  Petitioner's counsel responded that
25  Petitioner had no opposition to the panel which consisted of Presiding Commissioner Garner and
    Commissioner Blonien.  Thus, Petitioner expressly waived his right to claim that he was denied
26  his right to an impartial panel.

1    It is therefore ORDERED that Petitioner's application for habeas corpus relief (doc. 1) is

2  DENIED.  The clerk is directed to enter judgment and close the case.

3  /////

4  DATED: July 14, 2008

5                                                       /s/ Arthur L. Alarcón

                                                        UNITED STATES CIRCUIT JUDGE
6                                                       Sitting by Designation

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26